COMMONWEALTH of Pennsylvania,
Appellant

v.

Kenneth MACONEGHY, Jr., Appellee

No. 81 MAP 2016

Supreme Court of Pennsylvania.

ARGUED: March 8, 2017
DECIDED: October 18, 2017

Andrew John Jarbola III, Esq., Maric-lare Lawless, Esq., John Henry Scanlon IV, Esq., Lisa Ann Swift, Esq., Lackawanna County District Attorney's Office, for Appellant.

Donna M. DeVita, Esq., Lawrence J. Moran, Esq., for Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

CHIEF JUSTICE SAYLOR

The question presented concerns whether, in a criminal prosecution, a sexual abuse evaluator may testify to his opinion that a child was sexually assaulted, where there is no physical evidence of abuse, and the opinion is premised upon the expert's apparent acceptance of the child's reporting and description.

In 2011, when she was sixteen years old, the victim, C.S., reported that she had been raped and otherwise sexually abused repeatedly by her stepfather, Appellee Kenneth Maconeghy, Jr. C.S. related that the assaults had occurred in the home that she shared with her mother, Appellee, and several siblings, during the summer months of 2005, when she was eleven years old. Appellee was arrested and charged with various sexual crimes, including rape by forcible compulsion and rape of a child.

At trial, the Commonwealth presented several witnesses, including C.S., who testified to the abuse. Most relevant for present purposes, the prosecution also adduced testimony from Quentin Thomas Novinger, M.D., a pediatrician who had evaluated C.S. to determine whether she had suffered from sexual abuse.

On direct examination, Dr. Novinger explained that he regularly rendered consultative services on behalf of the Children's Advocacy Center for Northeastern Pennsylvania, and, in this capacity, he had been engaged to evaluate C.S. He indicated that he observed a forensic interview of C.S.

and collected and reviewed other historical information, then he conducted a physical examination. Although Dr. Novinger found no evidence of abuse in the physical exam, he opined that, outside the first seventy-two hours after the occurrence of a sexual assault, such an examination is unlikely to detect evidence of the abuse. See, e.g., N.T., Jan. 21, 2014, at 210. Thus, according to the pediatrician, the fact of abuse can be determined "[r]eally by history only." Id. at 206.

On cross-examination, the defense repeatedly attempted to secure a concession that the medical evidence did not support a determination of abuse, to which Dr. Novinger replied: "The history she provided to me pretty clearly indicated that she was sexually abused." Id. at 219; see also id. at 228 ("Clearly the medical encounter[, including the history,] indicated the child had been victimized."). On redirect, the district attorney posed a series of questions directed toward highlighting that a physical examination is not conclusive, culminating in the following interchange:

[Prosecutor]: And when you're saying that your examination is normal, you're not saying that nothing happened, are you?

[Dr. Novinger]: That's correct. I really believe strongly that was my medical conclusion that this child was victimized.

Id. at 229.

Appellee's lawyer did not lodge an immediate objection to any of these statements, but the following day he asked that the first of them be stricken from the record. See N.T., Jan. 22, 2014, at 21. The court noted the objection but reasoned that the opinion was appropriately grounded and that it would place undue emphasis on the testimony to reference it at that

juncture. *See id.* at 22–23.[1]

Appellee was convicted of the charged crimes and lodged an appeal in the Superior Court, which vacated the judgment of sentence and remanded for a new trial. *See Commonwealth v. Maconeghy*, 2191 MDA 2014, *slip op.*, 2015 WL 7078462 (Pa. Super. June 12, 2015). In its opinion, the panel refused to consider Appellee's challenge to Dr. Novinger's statement that the history C.S. had provided indicated that she was sexually abused, because this was adduced by defense counsel on cross-examination. *See id.* at 10 n.5, 2015 WL 7078462, at *4 n.5. Accordingly, the panel focused on the pediatrician's statement, on redirect, offering a medical conclusion that C.S. had been victimized.

Initially, the panel recognized that the admissibility of expert testimony is a matter generally committed to the sound discretion of the trial courts. *See id.* at 6, 2015 WL 7078462, at *3. The panel explained, however, that experts are forbidden from opining as to the credibility of fact witnesses. *See id.* at 7, 2015 WL 7078462, at *3 (citing *Commonwealth v. Seese*, 512 Pa. 439, 443, 517 A.2d 920, 922 (1986)).

In this regard, the panel alluded to a series of decisions in which this Court had: determined that an expert had intruded on the jury's function via testimony that children generally do not fabricate reports of abuse, *Seese*, 512 Pa. at 444–45, 517 A.2d at 922; disapproved expert testimony concerning typical behavioral patterns exhibited by sexually abused children, *see Com-*

*monwealth v. Balodis*, 560 Pa. 567, 576–77, 747 A.2d 341, 345–46 (2000); and held that expert testimony that a victim displayed behavioral patterns consistent with those typically displayed by sexually abused children was inadmissible, *see Commonwealth v. Dunkle*, 529 Pa. 168, 183, 602 A.2d 830, 837 (1992).[2] Further, the panel noted the Superior Court's own previous admonition that "the admissibility of expert testimony in child abuse cases must be evaluated cautiously in order to prevent encroachment upon the jury's function by the unfair enhancement of a child victim's credibility." *Maconeghy*, 2191 MDA 2014, *slip op.* at 7, 2015 WL 7078462, at *3 (quoting *Commonwealth v. Hernandez*, 420 Pa.Super. 1, 8, 615 A.2d 1337, 1340 (1992)). The panel also discussed the legislative enactment pertaining to expert testimony in various criminal proceedings involving sexual offenses, which now authorizes certain professionals to testify as to "specific types of victim responses and behaviors." 42 Pa. C.S. § 5920(b)(2); *see supra* note 2. In particular, the panel highlighted the statute's disapproval of opinions about witness credibility. *See* 42 Pa.C.S. § 5920(b)(3) ("The witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible.").

The panel concluded that Dr. Novinger's testimony that he believed that C.S. was sexually abused, based on her statements to such effect, "improperly constituted an opinion as to whether the victim was telling the truth, and intruded into the jury's

---

1. Dr. Novinger's expert report was also admitted into evidence without objection, in which he indicated that C.S. "provides a very credible disclosure of ... sexual assault that occurred in the summer 5 years ago." N.T., Jan. 21, 2014, at 192 & Ex. C–4; N.T., Jan. 22, 2014, at 67.

2. The decisions in at least *Dunkle* and *Balodis* are impacted by the enactment of Section

5920 of the Judicial Code, which now permits certain expert witnesses to testify to facts and opinions regarding specific types of victim responses and behaviors. *See* 42 Pa.C.S. § 5920(b)(2). *See generally Commonwealth v. Olivo*, 633 Pa. 617, 637, 127 A.3d 769, 781 (2015). It is beyond the scope of this opinion to discuss the specific effect of the statute on these cases.

function to assess the credibility of witnesses." *Maconeghy*, 2191 MDA 2014, *slip op.* at 9–10, 2015 WL 7078462, at *4; *see also id.* at 10, 2015 WL 7078462, at *5 (indicating that Dr. Novinger's statements "encroached on the jury's function as the sole arbiter of credibility"). In this regard, the panel relied upon this Court's *Seese* decision, as follows:

> As our Supreme Court observed in *Seese*, "[s]uch testimony, admitted as evidence, would encourage jurors to shift their focus from determining the credibility of the *particular* witness who testified at trial, allowing them instead to defer to the so-called 'expert' assessment [of the class of people of which the particular witness is a member]. In addition, such testimony would imbue the opinions of 'experts' with an unwarranted appearance of reliability upon a subject, veracity, which is not beyond the facility of the ordinary juror to assess."

*Id.* at 10–11, 2015 WL 7078462, at *5 (quoting *Seese*, 512 Pa. at 444, 517 A.2d at 922 (emphasis in original)). Given its determination that the testimony was inadmissible, and in light of the trial court's refusal to issue a curative instruction, the panel concluded that it was constrained to award a new trial. *See id.*

■ After the Superior Court denied reargument, this Court allowed appeal, limited to the following issue:

> Whether the Superior Court erred in finding that Dr. Novinger' statement that he believed the child was victimized encroached on the jury's function as the sole arbiter of credibility when the case law that the Superior Court relied on does not warrant such a result.

*Commonwealth v. Maconeghy*, —— Pa. ——, 163 A.3d 395 (2016) (*per curiam*).[3]

Presently, the Commonwealth argues that the Superior Court errantly failed to distinguish between cases that pertain to behavioral experts and those that involve medical professionals, such as Dr. Novinger. Relative to this proposed "behavioral/medical" distinction, the Commonwealth posits that "Pennsylvania case law has essentially determined what type of expert falls into the category of those whose testimony improperly bolsters the credibility of witnesses," *i.e.*, behavioral experts only. Brief for Appellant at 14; *see also id.* at 11 ("Dr. Novinger's testimony was *not* based on the behavior of the victim as compared

---

**3.** In its petition for allowance of appeal, the Commonwealth also sought this Court's review concerning whether Appellee had waived his challenge to Dr. Novinger's opinion and/or opened the door to that opinion. This Court, however, specifically *declined* review of those contentions, and we offer no opinion concerning their merits. Rather, we focus exclusively upon the issue accepted for review.

In dissent, Justice Mundy disregards the limited basis on which appeal was allowed, while criticizing this opinion for "reward[ing]" Appellee with a new trial. Dissenting Opinion, at 727 (Mundy, J.). We note that Justice Mundy's approach of addressing an issue which was expressly rejected at the allocatur stage is inconsistent with the many decisions in which this Court has disciplined itself to adhere to the questions selected for discretionary review. *See, e.g., Commonwealth v. Watts*, 611 Pa. 80, 84 n.2, 23 A.3d 980, 982 n.2 (2011) (declining to consider arguments "encompass[ing] topics that are outside the scope of our grant of allowance of appeal"). The contrary approach of pursing unaccepted side issues obviously impedes the Court's ability to address the matters of substantial public importance that are selected for review. Moreover, Appellee would certainly be entitled to post-conviction consideration concerning the stewardship of his counsel relative to the case-specific concern raised by Justice Mundy (albeit that this Court's decision concerning the question of widespread public significance would be substantially delayed or thwarted). Accordingly, some circumspection is in order

to the typical victim of sexual assault." (emphasis in original)); *id.* at 24 (drawing a distinction between "objective medical facts" and "speculative explanations for patterns of behavior" (emphasis deleted)). The Commonwealth distinguishes Dr. Novinger's credentials as a medical doctor and stresses the depth of his training and experience. *See, e.g., id.* at 6 (explaining that the pediatrician "testified that in the past 32 years, he evaluated between 500 and 1000 children"). Additionally, the Commonwealth draws support for the distinction that it envisions from Section 5920 of the Judicial Code. *See id.* at 12 (opining that "the legislature codified the prohibition of a witness's opinion regarding credibility of the victim *only with regard to behavioral experts*, not medical experts like Dr. Novinger." (emphasis in original)).

▮ The Commonwealth also denies that Dr. Novinger commented upon C.S.'s credibility at all, asserting that the pediatrician's testimony went only to his "medical encounter" with C.S. and did not concern her truthfulness. Brief for Appellant at 12. To the degree that this Court would discern any bolstering effect—and while otherwise recognizing that, under this Court's longstanding decisional law, *no* expert testimony is to be employed to validate the credibility of other witnesses—the Commonwealth reverts to the more general proposition that such testimony is admissible if it will assist the trier of fact in understanding the evidence or in determining a fact in issue. *See* Pa.R.E. 702(b).

The Commonwealth also draws support from this Court's decisions in *Commonwealth v. Minerd*, 562 Pa. 46, 55–56, 753 A.2d 225, 230 (2000) (approving the admissibility of expert testimony explaining that the absence of physical trauma does not disprove abuse), and *Commonwealth v. Rounds*, 518 Pa. 204, 209–10, 542 A.2d 997, 999 (1988) (disapproving medical testimony that abuse had occurred on the ground that the testimony was based on a case history that was not before the jury). With regard to *Minerd*, the Commonwealth observes that the Court allowed the relevant expert testimony even though it had some effect in terms of enhancing the veracity of children. *See Minerd*, 562 Pa. at 55, 753 A.2d at 230. Concerning *Rounds*, the Commonwealth highlights that the Court did not disapprove diagnoses of abuse generally, but rather, relied on the absence of underlying record support for the diagnosis. *See Rounds*, 518 Pa. at 209–10, 542 A.2d at 999. The Commonwealth also discusses several other cases from the Superior Court.

The Commonwealth concludes its argument with the following hyperbole: "Excluding an opinion based on a medical encounter because the evaluation included a history would make it impossible for a medical doctor to be presented as a witness in any case involving sexual assault, a result clearly not intended by our courts or legislature." Brief for Appellant at 34.[4]

---

relative to the depiction of an undue "reward."

4. This case does not concern many of the complex permutations in the child sexual assault arena, such as cases in which medical experts premise their conclusions at least in part upon physical findings or speak in general terms about victim characteristics. Accordingly, the above statement is not well taken. The appeal also does not govern the "myriad forms of salutary expert opinion evidence"

envisioned by the dissent. Dissenting Opinion, at 723 (Todd, J.). *See generally Oliver v. City of Pittsburgh*, 608 Pa. 386, 395, 11 A.3d 960, 966 (2011) (explaining that the holding of a judicial decision is read against its facts) (citing *Commonwealth v. McCann*, 503 Pa. 190, 195, 469 A.2d 126, 128 (1983))). What it does concern is the admissibility of testimony by a sexual abuse evaluator predicated on a child-victim's account and tied directly to the ultimate issue in the case concerning whether the defendant perpetrated sexual crimes.

■ As the Superior Court explained, evidentiary rulings are within the general province of the trial courts and will not be overturned by an appellate court absent an abuse of discretion, as, for example, when the law is overridden or misapplied. *See, e.g., Commonwealth v. Flor*, 606 Pa. 384, 414, 998 A.2d 606, 623 (2010). In terms of the applicable law, expert testimony is generally admissible if: the witness has a specialized knowledge beyond that possessed by the average layperson; such knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and the expert's methodology is generally accepted in the relevant field. *See* Pa.R.E. 702. Under longstanding Pennsylvania precedent pertaining to jury trials, however, determining witness credibility is exclusively the function of jurors, and expert witnesses are specifically prohibited from invading this province. *See, e.g., Commonwealth v. O'Searo*, 466 Pa. 224, 229, 352 A.2d 30, 32 (1976) (holding that the issue of witness credibility is within the knowledge of the average layperson and must be determined solely by the finder of fact).

■ Upon our review, we hold that an expert witness may not express an opinion that a particular complainant was a victim of sexual assault based upon witness accounts couched as a history, at least in the absence of physical evidence of abuse. We find that such testimony intrudes into the province of the jury relative to determining credibility. Such conclusion is consistent with a wide body of decisions in other jurisdictions. *See, e.g., United States v. Charley*, 189 F.3d 1251, 1267 n.23 (10th Cir. 1999) (collecting cases); *State v. Buchholtz*, 841 N.W.2d 449, 459 (S.D. 2013) (same).

The decision in *State v. Iban C.*, 275 Conn. 624, 881 A.2d 1005 (2005), is illustrative and is essentially on all fours with the issue presented in this case.[5] There, a pediatrician testified in a child sexual assault case that the complainant manifested no physical signs of abuse; the physician nevertheless rendered a diagnosis of abuse based both upon the physical examination and the complainant's history developed by an investigative team. *See id.* at 1013–14. The Connecticut Supreme Court held that the trial court had abused its discretion in admitting such testimony, because the pediatrician's opinion was inextricably tied to her belief in the complainant's veracity. In this regard, the court reasoned:

> [B]y [the pediatrician's] own admission, her diagnosis depended on a belief in this same credibility [that was central to the jurors' determination] because her ultimate assessment was based almost entirely on the history provided by the victim and the victim's mother to the investigation team. [The pediatrician's] diagnosis of child sexual abuse, therefore, necessarily endorsed the victim's credibility, and functioned as an opinion as to whether the victim's claims were truthful.

*Id.* at 1015. Additionally, the Connecticut court determined that the opinion evidence "was not helpful to the jury in deciding the precise question on which it had to pass." *Id.* at 1016–17. The court proceeded to distinguish the circumstances from cases in which expert testimony concerning the general characteristics of sexual assault victims had been permitted, *i.e.*, testimony that did not specifically link those characteristics to the complainant. *See id.* at 1015.[6]

---

**5.** Parenthetically, dictum from the *Iban C.* decision was subsequently questioned by the Connecticut Supreme Court on grounds of tangential relevance to the present decision. *See State v. Favoccia*, 306 Conn. 770, 51 A.3d 1002, 1022–24 (2012); *see also infra* note 10.

Other courts have variously character-ized expert opinions that children have been sexually assaulted in the absence of physical evidence as "putting a certificate of veracity on the child's testimony," *Buch-holtz*, 841 N.W.2d at 459; "bolstering cred-ibility, *id.* at 458; "merely vouching," *Charley*, 189 F.3d at 1267; and "indirect vouching," *Favoccia*, 51 A.3d at 1025. *See generally Buchholtz*, 841 N.W.2d at 458 & n.4 (collecting cases for the proposition that "[m]ost jurisdictions restrict this type of expert testimony, raising concerns about improper bolstering of credibility and in-vading the province of the jury on deter-mining an ultimate issue"). We are in full agreement with the assessment of these courts in the relevant regard. Consistent with the Connecticut jurisprudence, we find no material distinction between direct vouching (*e.g.*, "I believe the complainant is telling the truth") and indirect vouching (*e.g.*, "I conclude that the complainant was sexually assaulted based upon the history she related.").

Most courts also recognize the high stakes involved in child sexual assault cases and the potential power and persua-siveness of testimony by those clothed with the mantle of professional expertise. *See, e.g., Peterson*, 537 N.W.2d at 868 (reflect-ing the Michigan Supreme Court's appreci-ation that the risks associated with expert vouching in child sexual assault cases are exacerbated by "the nature of the offense and the terrible consequences of a miscal-culation" given that, "[t]o a jury recogniz-ing the awesome dilemma of whom to be-lieve, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat" (quoting *People v. Beckley*, 434 Mich. 691, 456 N.W.2d 391, 404 (1990) (plurality))).[7] Accordingly, the courts have attempted to devise appropriate and neces-sary limitations, albeit differing in various respects concerning the appropriate bal-ance to be stricken.

Significantly, this Court's previous deci-sions place Pennsylvania among a minority of jurisdictions in which the highest court has taken a most restrictive approach. For example, although a majority of jurisdic-tions would appear to allow the prosecu-tion to adduce expert testimony concerning general characteristics of sexual assault victims, *see* 23A C.J.S. CRIMINAL PROCE-DURE AND RIGHTS OF ACCUSED § 1506 (2017), this Court's decisions had disapproved of such evidence on the grounds that it in-vades the province of jurors. *See, e.g., Bal-odis*, 560 Pa. at 576–77, 747 A.2d at 345–

---

6. *Accord Charley*, 189 F.3d at 1267; *Tex S. v. Pszczolkowski*, 236 W.Va. 245, 778 S.E.2d 694, 708–09 (2015); *State v. Kromah*, 401 S.C. 340, 737 S.E.2d 490, 500 (2013); *State v. Towe*, 366 N.C. 56, 732 S.E.2d 564, 568 (2012); *Buchholtz*, 841 N.W.2d at 459; *State v. Southard*, 347 Or. 127, 218 P.3d 104, 113 (2009); *State v. Mars*, 116 Hawai'i 125, 170 P.3d 861, 876–77 (2007); *People v. Peterson*, 450 Mich. 349, 537 N.W.2d 857, 868, *amend-ed on other grounds*, 450 Mich. 1212, 548 N.W.2d 625 (1995); *People v. Taylor*, 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131, 138–39 (1990).

7. *Accord Maryland v. Craig*, 497 U.S. 836, 868, 110 S.Ct. 3157, 3175, 111 L.Ed.2d 666

(1990) (Scalia, J., dissenting, joined by Bren-nan, Marshall, and Stevens, JJ.) (cautioning that courts should be particularly vigilant in ensuring fairness to defendants in child sexu-al abuse cases, given reliability issues associ-ated with the suggestibility of children and the concomitant possibility of distorted or coerced recollections). *See generally Common-wealth v. Topa*, 471 Pa. 223, 232, 369 A.2d 1277, 1282 (1977) (recognizing that expert testimony and scientific proofs carry the po-tential to "assume a posture of mystic infalli-bility in the eyes of a jury of laymen" (quoting *United States v. Addison*, 498 F.2d 741, 744 (D.C. Cir. 1974))).

46.[8] It would be incongruous indeed for the Court to now forge a minority pathway on the opposite side of the spectrum by sanctioning the admission of evidence having a more direct bolstering effect specific to the complainant.

In response to the Commonwealth's effort to distinguish medical experts from behavioral ones, the credentials of medical professionals do not insulate them from the prohibition against invading the province of jurors. *See, e.g., Southard*, 218 P.3d at 112 (reasoning, relative to a physician's diagnosis of abuse, that "[t]he fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of the scientific method, created a substantial risk that the jury 'may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence'" (quoting *State v. Brown*, 297 Or. 404, 687 P.2d 751, 773 (1984))).[9] Along these lines, the Commonwealth's references to a broader "medical encounter" also are not persuasive, since Dr. Novinger grounded his opinion on the history provided by C.S. *See, e.g.*, N.T., Jan. 21, 2014, at 219. Thus,

the opinion is inextricably intertwined with the veracity of her statements.

We acknowledge that a number of states allow the admission of a medical diagnosis of child sexual assault where this is premised, at least in part, upon physical findings. *See, e.g., State v. Chandler*, 364 N.C. 313, 697 S.E.2d 327, 331 (2010) ("[F]or expert testimony presenting a definitive diagnosis of sexual abuse, an adequate foundation requires supporting physical evidence of the abuse."). Notably, a well-developed decision in this line of cases both carefully delineates relevant criteria to be assessed in determining admissibility and reaffirms that, in the absence of physical evidence of abuse, such diagnoses are inadmissible. *See State v. Beauvais*, 357 Or. 524, 354 P.3d 680, 689–90 (2015). Because, however, there was no physical evidence of abuse in the present case, we are not called upon here to determine the admissibility of expert testimony in circumstances where physical evidence is present or to consider what if any restrictions should attend admission.[10]

---

**8.** *See generally Favoccia*, 51 A.3d at 1025 (classifying Pennsylvania among a small minority of jurisdictions concerning this issue); Note, Dyane L. Noonan, *Where Do We Go From Here? A Modern Jurisdictional Analysis of Behavioral Expert Testimony In Child Sexual Abuse Prosecutions*, 38 SUFFOLK U.L. REV. 493, 503–05 (2005) (same).

The more prevalent controversy in other cases has generally been whether an expert may link a specific complainant to those general characteristics. *See Favoccia*, 51 A.3d at 1009 (concluding that, "although expert witnesses may testify about the general behavioral characteristics of sexual abuse victims, they cross the line into impermissible vouching and ultimate issue testimony when they opine that a particular complainant exhibited those general characteristics").

**9.** In this vein, the Commonwealth's position that Section 5920 of the Judicial Code pertains only to "behavioral experts" as such is quite tenuous. Indeed, with his impressive

training and experience in the evaluation of sexual abuse, Dr. Novinger would likely be quite surprised to hear that he is not a professional with "specialized training or education in ... victim services issues ... related to sexual violence." 42 Pa.C.S. § 5920(b)(1). The focus of Section 5920 simply is not on the particularized credentials of the expert, but rather, on sanctioning the admission of qualified expert testimony "regarding specific types of victim responses and victim behaviors." *Id.* § 5920(b)(2).

**10.** We also do not presently have the occasion, in the aftermath of the passage of Section 5920 of the Judicial Code, to determine whether or to what extent experts may opine that a child-complainant's behavior or symptoms are "consistent with" abuse. Notably, jurisdictions are divided on this issue as well. *Compare, e.g., Iban C.*, 881 A.2d at 1015 (approving of the "consistent with" phraseology), *with Favoccia*, 51 A.3d at 1023–24 (disapproving of the same). *See generally United States v.*

With regard to *Minerd* and *Rounds*, the evidence in *Minerd* fell within the class of *generalized* evidence about victims of sexual assault that is more widely approved in the courts and was focused on a physical examination; indeed, the Court specifically noted that the expert witness "confirmed that she was not stating that the alleged acts did or did not occur" relative to the complainant. *Minerd*, 562 Pa. at 52, 753 A.2d at 228. *Rounds* did concern expert testimony particular to the complainant, but the decision may have been shaped by the manner in which the issues were presented to the Court. Accordingly, while *Rounds* may provide some inferential evidence that the Court was not then consciously inclined to disapprove expert witness opinions that abuse has occurred within the contours of the case as it had developed, *see Rounds*, 518 Pa. at 207, 542 A.2d at 998 (observing an expert witness's opinion that a child was sexually abused, without disapproving of the testimony other than on the ground that the underlying history was not adduced at trial), there is no developed reasoning in the opinion on this subject.[11] Thus, we decline to accord material significance to that decision in this case. Finally, to the extent there is any conflict between our present opinion and those of the Superior Court cited in the parties' briefs or otherwise, the latter are now disapproved in the relevant respect.

In summary, we agree with the Superior Court, as well as the wide body of decisions from other jurisdictions, that expert testimony opining that a child has been sexually abused—which is predicated on witness accounts and not physical findings—is inadmissible. Our decision is limited according to the terms of this opinion as expressed throughout. For example, we are not presently assessing whether, or under what circumstances, such evidence may be appropriate in light of physical findings or as fair response on redirect examination or in rebuttal.

The order of the Superior Court is affirmed.

Justices Baer, Donohue and Dougherty join the opinion.

Justice Todd files a dissenting opinion.

Justice Mundy files a dissenting opinion.

Justice Wecht did not participate in the consideration or decision of this case.

## JUSTICE TODD, dissenting

The majority holds that Dr. Novinger's expert opinion that C.S. was sexually abused was inadmissible because it was founded solely on his crediting her reports of the abuse and, thus, in the majority's view, invades the jury's province as the sole arbiter of witness credibility. In my view, the majority overlooks an important

*DeNoyer*, 811 F.2d 436, 438 & n.3 (8th Cir. 1987) (characterizing "consistent with" as "the customary cautious professional jargon of the medical profession for what lawyers would speak of as causation"). The Superior Court's opinion in *Commonwealth v. Ferguson*, 377 Pa.Super. 246, 546 A.2d 1249 (1988), which is referenced in the parties' briefs, touches on this issue, albeit that it predates Section 5920. Review of that decision is also beyond the scope of our review here.

11. From *Rounds*, Justice Todd draws the proposition that "the expert testimony on a subject other than witness credibility is not transformed into an opinion on the subject of credibility solely because it is founded on a witness's prior statements." Dissenting Opinion, at 721 (Todd, J.). There is no evidence that any such issue was ever presented to the Court in *Rounds*; certainly the *Rounds* Court did not actually make this pronouncement; and we reject the notion that precedent should be discerned by inferences of the sort drawn by the dissent.

distinction between expert testimony *on the subject of* witness credibility, which is inadmissible, and expert testimony on other subjects which are merely *founded on assessments* of witness credibility, which are not *ipso facto* inadmissible. I am concerned that the majority's holding will lead to the exclusion of myriad types of salutary expert testimony which would not infringe upon the jury's role, but, rather, would assist the jury in its execution of its duties as the finder of fact. I further fear that the majority's holding is particularly troublesome in the context of prosecutions for child sexual abuse, where pediatricians frequently rely on non-physical evidence of such abuse, where physical evidence is exceedingly rare, and where juries commonly labor under outdated myths to the contrary. Accordingly, I respectfully dissent, and would reverse the Superior Court's order and reinstate Appellee's convictions and judgment of sentence.

As the majority summarizes, in 2011, C.S. reported that, in the summer of 2005, when she was 11 years old, Appellee repeatedly raped and otherwise sexually abused her over a period of several months, at times when her mother and siblings were absent from their home. In the ensuing investigation, C.S. was referred to the Children's Advocacy Center of Northeastern Pennsylvania ("CAC"), where she underwent a forensic interview with a certified forensic interviewer, detailing the abuse, which was observed by the CAC's former director and then-consulting pediatrician, Dr. Novinger. C.S. then underwent a forensic medical examination performed by Dr. Novinger, who ultimately determined that C.S. was sexually abused.

Appellee was arrested and charged with, *inter alia*, rape, rape of a child, statutory sexual assault, aggravated indecent assault of a person less than 13 years of age, endangering welfare of children, indecent assault of a person less than 13 years of age, corruption of minors, and unlawful contact with a minor,[1] and proceeded to a jury trial, at which C.S. testified at length to the details of the abuse. Specifically, C.S. indicated that, during the summer of 2005, she lived with Appellee, who was unemployed, her mother, who worked during the day, and her siblings. C.S. testified that, after her mother left for work, Appellee would send her siblings to a relative's house or otherwise isolate her, whereupon he would force her to bathe with him and engage in vaginal intercourse and other sexual conduct in their bath, on their couch, and in his bedroom. C.S. further testified that she did not understand that his behavior was abnormal, but that, by 2011, she had begun to appreciate the nature of her abuse. C.S. explained that, around that time, she was spending the weekend with her biological father and his girlfriend, and they were watching a television show which turned to the subject of rape, causing her to cry. According to C.S., her father then asked her if she had been victimized, and she ultimately disclosed what Appellee had done.

At issue herein, the Commonwealth elicited the testimony of Dr. Novinger, who testified at length to his experience as a pediatrician, and, particularly, as a pediatrician experienced in the evaluation and treatment of child sexual abuse victims. Specifically, Dr. Novinger indicated that he had 37 years of experience as a practicing, board-certified pediatrician, which included, *inter alia*, chairing the Depart-

---

1. 18 Pa.C.S. §§ 3121(a)(1), 3121(c), 3122.1, 3125(a)(7), 4304(a), 3126(a)(7), 6301(a)(1), and 6318(a)(1), respectively.

ment of Pediatrics at Geisinger Wyoming Valley Medical Center, externing with a Children's Advocacy Center in San Diego, California, founding a clinic at Geisinger for the evaluation and treatment of child sexual abuse victims, serving as CAC's medical director for several years, and holding numerous seminars for medical and educational professionals concerning child sexual abuse. Dr. Novinger estimated that he had evaluated between 500 and 1000 children for signs of abuse, and that he had testified in myriad civil and criminal cases involving child sexual abuse.

Based on this experience, the Commonwealth offered, and the trial court certified, Dr. Novinger as an expert in the fields of pediatrics and child abuse. Dr. Novinger indicated generally that his forensic medical examination consisted of observing C.S.'s forensic interview, taking her medical history, including her account of the abuse, and conducting a physical examination, which yielded no physical evidence of the abuse. Dr. Novinger clarified that the lack of physical evidence neither corroborated nor undermined the Commonwealth's allegations. Indeed, Dr. Novinger explained that the "overwhelming majority" of physical examinations involving similar abuse reveal no physical evidence of the same:

> [The Commonwealth:] Doctor, I am going to get you ... to the area that I am most concerned about. You indicated on your report that everything seemed to be normal. Could you tell me a little bit about what we're looking for when you're looking at something in the hymeneal ring?
>
> [Dr. Novinger:] We're looking for evidence of acute, chronic, or healed trauma in light of the history that we're provided. We know that children—girls who are victimized, the overwhelming majority of their exams will be normal, and that's what we expect to find if it's greater than 72 hours. If it is less than 72 hours—in other words, we see the child less than 72 hours after they've been victimized—then about 70 percent will be normal. And so our expectation ... is that the exam would be entirely normal.
>
> [The Commonwealth:] Okay. But when you're going in on an examination based on the disclosure like you had in this case, what is your expectation? Do you think you're going to find something? Is there a red flag that waves around at the hymen as to a huge indicator flashing sign saying this person has been abused?
>
> [Dr. Novinger:] No. I mean we're objective in trying to—our goal is to identify and objectively examine and describe what we find. The truth of the matter is that the overwhelming majority of children, adolescent girls, who present with the sort of complaint that [C.S.] did their exam is normal.
>
> [The Commonwealth:] So is there a certain like watermark that you would think that you would see in patients that presented with this disclosure that [C.S.] had?
>
> [Dr. Novinger:] No. No. I would expect that her exam would be normal.

N.T. Trial, 1/21/14, at 203–05 (R.R. at 86a–88a). Dr. Novinger went on to explain that the reason that physical evidence is rare is because children who are abused frequently sustain no injuries during, or heal after, the abuse, contrary to long-held cultural beliefs:

> [Dr. Novinger:] [W]e know that the hymen and the surrounding structures of ... the vagina is the mucosa, similar to the mucosa that is inside your mouth. We know that this part of the body heals up very quickly should

there be an injury. We know that in the event we see a child very early after an incident in which she is sexually assaulted, and there is evidence of trauma, that if you check the same child three weeks later, the trauma is completely healed and there really is no residual finding whatsoever, and over the majority of the time that is the case. So I think there's an idea of a culture belief in virginity, which is really a myth. In other words, in children and in anyone who experiences sexual activity, the idea that they're changed in some way as a result is really a myth. That the overwhelming majority of times they're really not changed in any way. As I show there, the hymeneal rim, it's actually ... not a membrane and therefore it's not something that necessarily is traumatized by penetration. It's made of tissue, which is very elastic. And I mean obviously this is where a baby comes from and the good Lord made that part of the body to stretch. And so we know that adolescents can experience stretching there either as a [result] of sexual assault or even as the result of [a] speculum exam ... and have no evidence of any trauma.

*Id.* at 205–06 (R.R. at 88a–89a). Doctor Novinger then explained that, because physical examinations typically reveal no physical evidence of abuse, physicians forming expert opinions on whether a child was sexually abused rely largely on the child's provided history, explaining that his experience and a series of medical publications similarly refute the notion that one's "virginity" can be determined by resort to physical examination:

[The Commonwealth:] Doctor, I'm just going to back you up a little bit. You touched upon the fact that you're talking about whether this idea that we have as a society of a virgin, what have you had in your experience and in the medical literature that says that the examination of a person who has had intercourse versus the examination of a person who hasn't had intercourse, how you would be able to differentiate the difference between those two?

[Dr. Novinger:] Really by history only. There is really no physical difference between the two, and in the context of medical literature today, the term virgin would not be used because it really has no medical basis. The idea that a virgin is someone who has not had the change of someone who had experienced a sexual experience or sexual assault is really a long, long standing myth. It's a cultural belief that [the] medical field just does not support.

[The Commonwealth:] Where do you get this information from when you're talking about the medical literature?

[Dr. Novinger:] Besides my personal experience at the CAC, there's a published peer review in medical literature that at this point universally supports the significant fact that the hymenal ring is typically not changed by any penetration.

[The Commonwealth:] Doctor, when you authored your report ... with regard to what your findings were with [C.S.], you would expect them to be normal, right?

[Dr. Novinger:] Yes.

[The Commonwealth:] Do you cite this book, Child Abuse, Medical Diagnosis and Management as a reference to say that you would expect that examination to be normal based on her disclosure?

[Dr. Novinger:] Yes.

[The Commonwealth:] Is this a book that you find to be authoritative and

that others in your profession would find authoritative in the area of child abuse?

[Dr. Novinger:] Yes.

[The Commonwealth:] Doctor, is there a specific article that you mentioned in your report ... that basically describes that whole idea of virgin in the context of medical research?

[Dr. Novinger:] Yes. I have to emphasize there's a number of different articles. There is one particular one in 2004 published by Nancy Kellogg and others in which they examined 36 adolescent girls, all of whom were pregnant. So by definition they have had sexual experience and described their hymenal anatomy, and the overwhelming majority of these pregnant adolescents, hymenal anatomy was completely normal. There was no evidence of acute trauma, blunt trauma, notching, anything like that that you would expect from a belief that somehow they're changed by a sexual experience. ... Two of the 36 were not normal, and actually one of the 36 had—it was actually her second child. I think there was a belief that somehow the hymen disappears after their first sexual experience, and again, that's a cultural myth that is part of a young woman's anatomy. It doesn't go away. And in most cases it's not changed.

*Id.* at 206–09 (R.R. at 89a–92a).

On cross-examination, Appellee's counsel attempted to characterize Dr. Novinger's testimony as indicating that the medical evidence did not corroborate the Commonwealth's allegations of abuse, but Dr. Novinger rejected the characterization, noting that a portion of the "medical evidence"—C.S.'s medical history—indicated she was abused:

[Appellee's Counsel:] Dr. Novinger, you testified at length about this exam. Of course you started the testimony by agreeing that the medical evidence that you observed in this alleged victim did not support an allegation that there was sexual abuse.

[Dr. Novinger:] The history she provided to me pretty clearly indicated that she was sexually abused.

*Id.* at 218–19 (R.R. at 101a–02a). Appellee's counsel clarified that, by "medical" evidence, he was referring to physical evidence, and, ultimately, asked Dr. Novinger whether he could offer an opinion as to whether C.S. was sexually abused based solely thereon. Dr. Novinger responded that he could not, but that his opinion, based on the forensic medical examination as a whole, was that C.S. had been sexually abused:

[Appellee's Counsel:] Based on your physical examination, you can't testify here today to a degree of medical certainty as to whether or not this particular victim was sexually assaulted.

[Dr. Novinger:] I really can't speak to the different parts of the medical encounter. [The] [m]edical encounter included a history as well as a physical exam. As I said, the physical exam was normal. Clearly the medical encounter indicated the child had been victimized.

*Id.* at 228 (R.R. at 111a).

On redirect examination, the Commonwealth sought to emphasize that the lack of physical evidence did not undermine its allegations, and Dr. Novinger agreed, restating his conclusion that C.S. had been sexually abused:

[The Commonwealth:] [W]hen you're saying that your examination is normal, you're not saying that nothing happened, are you?

[Dr. Novinger:] That's correct. I really believe strongly that was my medical conclusion that this child was victimized.

*Id.* at 229 (R.R. at 112a). Notably, Dr. Novinger at no point identified Appellee, or any other specific individual, as the perpetrator of C.S.'s abuse.

Although not objecting at that time, the next day, Appellee's counsel made an oral motion to strike this testimony as "inappropriate opinion testimony that's not based on medical evidence or ... medical expertise." N.T. Trial, 1/22/14, at 22 (R.R. at 115a). The trial court denied the motion, reasoning that the testimony was an admissible medical opinion, based on the forensic medical examination as a whole, that C.S. had been sexually abused.

Ultimately, Appellee was convicted of the aforementioned offenses and sentenced to a term of 10½ to 30 years imprisonment. He appealed to the Superior Court, arguing that the trial court erred in denying his motion to strike because Dr. Novinger's testimony, founded solely upon his crediting C.S.'s reports of the abuse, indirectly vouched for C.S.'s credibility and invaded the jury's purview as the sole arbiter of credibility. The Superior Court agreed, reversing and remanding for further proceedings, and the Commonwealth sought allocatur, which we granted.

Before us, the Commonwealth argues, consistent with the trial court's analysis, that Dr. Novinger's testimony did not express an opinion on C.S.'s credibility, but, rather, expressed a medical opinion based on the forensic medical examination as a whole, that C.S. had been sexually abused. The majority rejects the Commonwealth's arguments based on the view, shared by some other jurisdictions, that an expert opinion that an individual was sexually abused, founded solely on the expert's crediting the individual's reports of the abuse, is "inextricably tied to [the expert's] belief in the complainant's veracity" and, thus, constitutes "indirect vouching" for the individual's credibility. Majority Opinion at 718–19. The majority further reasons that, because this Court has previously forbidden "expert testimony concerning general characteristics of sexual assault victims," "[i]t would be incongruous indeed for the Court to now forge a minority pathway on the opposite side of the spectrum by sanctioning the admission of evidence having a more direct bolstering effect specific to the complainant." *Id.* at 714 (citing *Commonwealth v. Balodis*, 560 Pa. 567, 747 A.2d 341 (2000)).

In my view, the majority's analysis in this regard conflates two distinct categories of expert testimony: expert opinions on the subject of witness credibility, which this Court has held inadmissible, and expert opinions on other subjects *founded* on a witness's prior statements, which are not *ipso facto* inadmissible. Indeed, this Court has not hesitated to reject expert testimony merely corroborating a witness's testimony or offering reasons why a witness (or class of witnesses) is credible. *See Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976) (rejecting expert psychological testimony corroborating a defendant's testimony concerning his lack of malice in shooting his victim); *Commonwealth v. Rounds*, 518 Pa. 204, 542 A.2d 997 (1988) (rejecting an expert's testimony that she believed a complaining witness); *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986) (rejecting expert testimony that prepubescent children do not typically fabricate abuse of being sexually abused because they lack sufficient knowledge of sexual behavior to do so); *Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830 (1992) (rejecting expert testimony explaining why child sexual abuse victims may delay reporting their abuse).[2]

However, with respect to the latter category—*i.e.*, expert opinions on other subjects which are merely *founded* upon credited reports of others—we have charted a somewhat different course. In *Rounds, supra*, we addressed a defendant's claim that his counsel was ineffective in failing to object to a medical opinion, based solely on the alleged victim's history, that the alleged victim had been sexually abused, on the ground that the expert had failed to state the basis for her opinion. *Rounds*, 542 A.2d at 997–99. Notably, we expressly rejected, albeit in *dicta*, the expert's explicit testimony that she *believed* the alleged victim, as an inadmissible expert opinion on her credibility, *see id.* at 997 n.4 (citing *Seese*, but noting the issue was not raised); however, we did not suggest that her opinion itself was inadmissible because it was based solely on the alleged victim's history. Rather, we appeared to reject the proposition, opining that it was counsel's duty to elicit from the expert that her opinion was rooted solely in the alleged victim's statement, and then to challenge the *opinion* as unreliable by challenging the *statement* as unreliable:

> [W]e must conclude that trial counsel was ineffective. There is no reason that can be offered for permitting the damaging opinion of [the expert] to be admitted without the facts upon which it was being considered. How could a jury evaluate the expert opinion without even knowing the facts upon which it was based[?] [The expert] testified that the case history was the single most important factor in reaching her conclusion. If the jury believed that the case history she received was inaccurate or false,

surely this would affect the validity of her opinion.

*Id.* at 999.

The majority acknowledges that *Rounds* "may provide some inferential evidence that the Court was then not consciously inclined to disapprove expert witness opinions that abuse has occurred within the contours of the case as it had developed," but nevertheless rejects the import of this passage on the ground that the court offered "no developed reasoning ... on this subject." Majority Opinion at 721. In my view, the more sound reading of the passage is as embracing the notion advanced by the Commonwealth herein: that expert testimony on a subject other than witness credibility is not transformed into an opinion on the subject of credibility solely because it is founded on a witness's prior statements.

Additionally, in *Commonwealth v. Minerd*, 562 Pa. 46, 753 A.2d 225 (2000), we considered whether a medical expert's testimony that the absence of physical trauma is nevertheless consistent with the alleged sexual abuse was inadmissible expert testimony as to credibility, ultimately adopting the view that it was proper, even if it tended to support a witness's credibility, in part because the expert did not opine directly as to any witness's credibility. *Id.* at 227–30 ("In this case, [the expert's] testimony was probative of the veracity of [the alleged victims]. However, [she] was neither asked for, nor did she express, any opinion as to whether the children were telling the truth about being sexually abused."). Admittedly, as the majority highlights, we also noted that the expert's testimony "only explained the significance of the results of the physical examination," and that her opinion was "inconclusive as

**2.** Notably, following *Dunkle*, the General Assembly enacted a provision permitting the introduction of such expert testimony under

certain circumstances, provided experts do not opine on the subject of witness credibility. *See* 42 Pa.C.S. § 5920.

to whether any abuse had even occurred." *Id.* However, in my view, these distinctions are insignificant: because the expert offered no opinion as to a witness's credibility, it did not invade the jury's province as the sole arbiter of credibility.

Given this distinction between expert opinions *about* credibility and expert opinions on other subjects rooted in the expert's credibility judgments, I am likewise unpersuaded by the majority's reliance on our preclusion, in *Balodis,* of "expert testimony concerning general characteristics of sexual assault victims," as supporting its analysis herein. Majority Opinion at 720. Simply put, the testimony in *Balodis* concerned "the general characteristics of child sexual abuse victims as those traits relate to a failure to promptly report abuse." *Balodis,* 747 A.2d at 343. That is, the testimony was offered to explain why child sexual abuse victims engage in conduct that would otherwise form a basis for attacking their credibility, and was not, like Dr. Novinger's testimony herein, an opinion on another subject which was merely rooted in crediting a witness's prior statements.

Moreover, the majority's apparent view that an expert opinion is inadmissible merely because it is rooted in the expert's assessment of the veracity of third-party statements is itself anomalous, as our Rules of Evidence and numerous decisions of this Court have essentially delegated the question of proper methodology for deriving, and the proper foundation of, expert opinions to the judgment of experts themselves, reflecting this Court's reluctance to substitute its judgment on those methodological questions for those of individuals learned and experienced in their respective specialized fields. *See* Pa.R.E. 702(c) (requiring that an "expert's methodology" be "generally accepted in the relevant field"); *Grady v. Frito–Lay, Inc.,* 576

Pa. 546, 839 A.2d 1038, 1044–45 (2003) (noting that "[o]ne of the primary reasons" for deferring to professional judgments concerning methodology is "its assurance that judges would be guided by scientists when assessing the reliability of a scientific method" and that the rationale applies with greater force over time due to "the ever-increasing complexity of scientific advances"); Pa.R.E. 703 ("If experts in the particular field would reasonably rely on ... facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."); *cf. Commonwealth v. Thomas,* 444 Pa. 436, 282 A.2d 693, 698 (1971) (noting that medical experts may testify to opinions based upon "reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession").

Indeed, I find myself largely in agreement with the Superior Court's decision in *Commonwealth v. Hernandez,* 420 Pa.Super. 1, 615 A.2d 1337 (1992), which the Commonwealth relies on in its brief. In that case, a criminal defendant raised a claim that his trial counsel was ineffective in failing to object to a medical expert's testimony that "assuming the truthfulness of the victim's history, the physical facts from a medical examination ... were consistent with the victim's allegation." *Id.* at 1338. The court rejected the defendant's claim, opining that a medical expert is free to base his opinion on methods and foundational facts or data that are reasonably relied upon in the field of medicine:

> The general rule governing admissibility of expert testimony is that "[e]xpert testimony is permitted only as an aid to the jury when the subject matter is ... beyond the knowledge or experience of the average layman. Where the issue involves a matter of common knowledge, expert testimony is inadmissible." *Com-*

*monwealth v. O'Searo*, 352 A.2d [at 32]. We are unaware of any precedent that establishes that an expert ... may not explain the assumptions on which he bases his opinion. .... [A] medical expert may base his opinion upon facts which are in the record and reports of others which are ... customarily relied upon in practicing medicine, including the observations of lay persons. It follows that a pediatrician ... may testify that the physical facts observed and reported by the treating physician were consistent with the allegation ... set forth in the history of the child. The medical history of a patient is customarily relied upon in practicing medicine. Consequently, it is not error for the expert to testify ... that his opinion assumes the truthfulness of the history supplied by the victim.

*Id.* at 1343.[3]

Finally, I am concerned that the majority's holding will undermine the admissibility of myriad forms of salutary expert opinion evidence. Indeed, one can readily imagine numerous kinds of appropriate expert opinions, rooted solely in the statements of others, that may now be prohibited. Doctors may be forbidden from testifying concerning their patients' diseases where their diagnoses are made on the basis of patients' or other medical professionals' statements or reports. Psychiatric professionals, whose diagnoses often rely solely on their evaluation of their patients'

mental states as evidenced by their verbal statements, may be precluded. These and numerous other experts may be forbidden from offering opinions based on third-parties' statements, even where their professions routinely rely on such statements. In my view, the exclusion of such expertise from the courts of this Commonwealth would deprive jurors of guidance they need. Moreover, as observed in *Grady, supra*, the ever-increasing complexity of modern life counsels toward greater deference to communities of experts as to the proper foundations of their expert opinions.

Such deprivation is particularly pernicious in the context of prosecutions for child sexual abuse. There is an extremely narrow temporal window for the collection of physical evidence of child sexual abuse like that which was alleged to have occurred in this case, such that the discovery of physical evidence is the exception, rather than the rule. *See, e.g.*, Bernd Herrmann, et al., Physical Examination in Child Sexual Abuse: Approaches and Current Evidence, Deutsches Arzteblatt International, 692–703, 700 (2014) (noting that physical examinations "reveal only normal findings in 90–95% of cases"); *id.* at 695 (explaining that " '[n]ormal' does not mean 'nothing happened' " and that "[n]ormal findings are the rule, not the exception, in victims of child sexual abuse, with or without penetration").[4] That narrow window almost always closes before a

---

**3.** In his brief, Appellee claims that *Hernandez* is distinguishable in that, therein, the expert based his opinion on both physical observations and the victim's history, and testified only that the data was consistent with abuse, rather than offering an affirmative opinion that abuse occurred. However, I do not find those distinctions to alter the appropriate answer to the salient question of whether the prohibition on expert opinions on witness credibility applies to opinions that are on subjects other than witness credibility, but

founded in assessments of the credibility of witnesses' prior statements.

**4.** Notably, Dr. Novinger testified that, even if a child victimized in the manner C.S. was allegedly victimized does manage to comprehend and report his or her victimization within a mere three days, medical professionals still expect an absence of physical evidence in approximately 70 percent of cases. N.T. Trial, 1/21/14, at 204 (R.R. at 87a).

child has time to cognitively and emotionally process his or her abuse—much less overcome the all-too-frequent confusion, embarrassment, guilt, and shame that accompany it—and to report it to anyone, including medical professionals. Moreover, medical professionals are comfortable and experienced in arriving at a diagnosis without physical evidence, and the absence of such evidence is often given too great of weight, outside of the medical profession, based on outdated cultural myths about virginity. *See also id.* at 700 (noting that "[t]he diagnosis of sexual abuse is usually based on a statement from the child, obtained in the correct way through sympathetic but not suggestive questioning"); *id.* at 695 (explaining that "[t]he medically documented fact that penetrating abuse may not be associated with any subsequently abnormal physical findings must be known and understood by the treating personnel and the government authorities ... so that the credibility of the victims will not be unjustly put in doubt"). Against this backdrop, I am troubled that the majority's departure from ordinary principles governing expert opinion foundation may only serve to deprive jurors of necessary expert determinations, demanding more than medical science requires and insisting on more than is present in all but a few cases of child sexual assault, where jurors are most in need of specialized knowledge on the subject.

I acknowledge that expert opinions based in whole or in part on assessments of the credibility of particular witnesses could conceivably tempt jurors to view those witnesses as credible. However, I do not view this concern as a sufficient reason to conclude that such expert opinions are, in and of themselves, opinions on witness credibility, nor do I think they unavoidably invite the jury to abdicate its role as the arbiter of credibility. Notably, litigants concerned that expert opinions are rooted in dubious credibility assessments are free, for example, to challenge those opinions as methodologically inappropriate in the expert's field of expertise. *See* Pa.R.E. 702(c). Moreover, litigants may argue that such opinions are more unfairly prejudicial than probative of the facts at issue. *See* Pa.R.E. 403. Additionally, litigants may take the course charted in *Rounds*: vigorous cross-examination with regard to an opinion's foundational components and argument to the finder of fact concerning the reliability of those components themselves. Indeed, as we indicated in *Rounds*, the persuasive value of an expert opinion demonstrably shown to rely solely on a hearsay account will, if properly explained to a jury, rise and fall with the persuasive value of that hearsay account. *See Rounds*, 542 A.2d at 999 ("If the jury believed that the case history [the expert] received was inaccurate or false, surely this would affect the validity of her opinion."). Appellee availed himself of none of these options.[5]

Thus, I would hold that the prohibition of expert testimony on credibility does not preclude expert opinions which do not opine as to a witness's credibility, but which address other subjects and are necessarily based on an expert's assessment of that credibility. Applying that rule herein, Dr. Novinger's testimony that he "believe[d] strongly that was [his] medical

---

5. I also note that a party is entitled to a cautionary instruction that such testimony is meant to establish the opinion's foundation, and is not substantive evidence. *See* Pa.R.E. 705 cmt. ("When an expert testifies about the underlying facts and data that support the expert's opinion and the evidence would be otherwise inadmissible, the trial judge upon request must, or on the judge's own initiative may, instruct the jury to consider the facts and data only to explain the basis for the expert's opinion, and not as substantive evidence.").

conclusion that [C.S.] was victimized" was properly admitted. Dr. Novinger's testimony, although based on C.S.'s history, contains no express opinion that C.S. was credible or incredible, or that children like C.S. are generally credible or incredible. Moreover, Dr. Novinger's testimony was not challenged on the basis that his opinion was rooted in methods or statements not customarily relied upon in the fields of pediatrics or child abuse, and, at no time did he testify on subjects irrelevant to his medical inquiry, such as whether Appellee was the perpetrator of the abuse. Indeed, Dr. Novinger, offered by the Commonwealth and certified by the trial court as an expert in the fields of pediatrics and child abuse, merely testified to his view, based on his expertise in those fields, that C.S. had been sexually abused. In my view, and contrary to the conclusion of the majority, our decisions emphasizing the jury's role as arbiter of credibility do not bar such testimony. Accordingly, I would hold that Appellee was not entitled to strike the testimony, and that the learned trial court did not err in denying Appellee's motion to do so, and thus, I would reverse the Superior Court's order and reinstate Appellee's convictions and judgment of sentence.

### JUSTICE MUNDY, dissenting

I join Justice Todd's dissenting opinion and share her concerns that the Majority's holding in this case will improperly limit expert testimony that would assist juries in their fact-finding role. It is a fundamental practice in patient care for a physician to obtain a patient history which includes a patient's presenting complaints and symptoms of illness or injury for use in the diagnosis and treatment of a patient. Hence, a patient history is an integral foundation on which a physician's medical opinion is based. The majority's holding that a treating physician in a child sexual assault case may not offer a medical opin-

ion as to whether a sexual assault occurred absent physical evidence improperly infringes upon the treating physician's ability to articulate the basis for his or her medical opinion.

I note that the contested testimony in this appeal was provided by the Commonwealth's expert witness, Dr. Novinger, during cross examination by defense counsel. I further note that defense counsel did not contemporaneously object to the testimony, but opted to raise an objection the following day, well after Dr. Novinger had left the Courtroom. A timely objection to Dr. Novinger's testimony would have provided the trial court with an opportunity to rule on its admissibility, and if necessary issue a curative instruction at the time it occurred. Although this issue is not addressed by the Majority, because it is inextricably connected to the issue presently before us, I find it necessary to address it.

The Superior Court determined Appellee had properly preserved his objection in the following footnote.

Although [Appellee]'s counsel did not contemporaneously object to Dr. Novinger's testimony at the earliest possible opportunity, we conclude that [Appellee] has not waived appellate review of this claim. "The purpose of contemporaneous objection requirements respecting trial-related issues is to allow the court to take corrective measures and, thereby, to conserve limited judicial resources." *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 42 (2011). Here, although the objection to Dr. Novinger's testimony was lodged the day after Dr. Novinger testified, the trial court still had the opportunity to correct a possible error. Accordingly, we find this claim appropriately preserved for appellate review. *See also Commonwealth v. Johnson*, 310 Pa.Super. 385, 456 A.2d 988, 994 (1983) (explaining that "although in

the vast majority of cases a 'timely objection' means a 'contemporaneous objection' . . . contemporaneity of objection is not insisted upon as a value in itself, rather it is required as the most convenient method of preventing a party from permitting error to insinuate itself into the record and complaining thereafter"; thus it is improper for counsel, deliberately, as a strategic decision, to refrain from objecting, but where there was "no attempt to 'insinuate error into the record and complain thereafter', and counsel strenuously attempted to excise the error, to find such an objection untimely, would indeed be to 'insist upon contemporaneity as a value in itself' "); Pa. R.Crim.P. 720(B)(1)(c) ("Issues raised before or during trial shall be deemed preserved for appeal whether or not the defendant elects to file a post-sentence motion on those issues.").

*Commonwealth v. Maconeghy*, 2191 MDA 2014, *slip op.*, 2015 WL 7078462 at *6 (Pa. Super. June 12, 2015).

In *Sanchez*, the appellant failed to object to the introduction of discrepancy evidence which he challenged for the first time on appeal. As noted by the Superior Court, this Court held, "[t]he purpose of contemporaneous objection requirements respecting trial-related issues is to allow the court to take corrective measures and, thereby, to conserve limited judicial resources." *Sanchez*, 36 A.3d at 42. However, this Court went on to hold "Appellant failed to raise any objection here and, instead, raised the issue for the first time via his Rule 1925(b) statement of matters complained of on appeal, in the guise of a sufficiency argument." *Id.* Therefore, *Sanchez* is inapplicable to the circumstances in this matter, where defense counsel failed to raise a contemporaneous objection but rather only lodged an objection the following day.

In *Johnson*, the defense counsel failed to timely object to the admission of an officer's testimony regarding undisclosed evidence. The following morning the defense moved for a mistrial. The trial court paused proceedings and conducted a suppression hearing. The Superior Court in *Johnson* ultimately determined the objection was timely and specific because it was made when defense counsel had become aware of the evidence previously unknown to them, and the trial court had taken swift action to remedy the situation by holding a suppression hearing.[1] The court went on to note that "a new trial is additionally, and particularly, required in view of the Commonwealth's failure to disclose the statement, in violation of Pa.R.Crim.P. 305 B(1)(b)." *Johnson*, 456 A.2d at 993.

In the instant matter, the trial court expressed its hesitancy to sustain defense counsel's objection the following day because no one could recall the exact language of the testimony and because it would place undue emphasis on Dr. Novinger's testimony. Specifically, the following exchange occurred.

> Defense Counsel: . . . One last thing for the record, as a trial attorney, we certainly hope we always act quickly on our feet; however, yesterday there was at the conclusion of Doctor . . . Novinger's testimony, there was a question asked of him and I can't remember the exact phrase but the question was that isn't it true that based on the physical examination, you are unable to render an opinion to a degree of medical certainty as to whether this alleged victim had been

---

1. Notably, the dissent disagreed in this circumstance and would have found the issue waived for failure to lodge the objection contemporaneous to the admission of the previously undisclosed evidence. *Johnson*, 456 A.2d at 993 (Brosky, J., dissenting).

abuse[d]? Dr. Novinger went on to state an opinion that he believed the victim was abused but that that was based on the history provided by the alleged victim. I certainly should have made an immediate motion to strike that testimony because I think it's inappropriate opinion testimony that's not based on medical evidence or his medical expertise. I think that the jury hearing that could be certainly prejudicial to my client, and although it's somewhat late at this point, I would make a motion to strike that testimony as it relates to his opinion as it was not based on medical testimony and to instruct the jury to disregard that opinion testimony.

The Court: My recollection of that question and answer, and I don't think it was isolated to one question and one answer, was that the opinions that he expressed were based on many things, not just the physical exam, but also the history that was taken, the consultation of the other reports and all of the other information. And that if he were asked to say could he express an opinion as to whether or not there was abuse strictly by physical findings, his answer was he could not; however, when he looked at the whole picture as to all of the information to be considered, it was his opinion that abuse had taken place.

So your objection is noted. You had the opportunity to cross-examine at the point in time. I did specifically ask whether or not you had any objection to the doctor being excused at that point in time and you indicated that you did not. But I think it would cause undo emphasis on a single portion of the doctor's testimony for me to now refer to it and then order it stricken

or modified in any way so your objection is noted but overruled.

N.T., 1/22/14, at 21–23.

Unlike *Johnson*, defense counsel was not blindsided by undisclosed information, should have been prepared for Dr. Novinger's testimony, and conceded his objection was untimely. Additionally, contrary to the trial court's actions in *Johnson*, the trial court took no remedial action and the trial continued. In my view, in light of long standing precedent in this Commonwealth, Appellee's issue was waived for failure to offer a timely objection. *Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59, 73 (2008) (holding "it is axiomatic that issues are preserved when objections are made timely to the error or offense[ ]"); *Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531, 535 (1986) (holding a failure to object to a witnesses testimony while the witness was on the stand justified overruling a motion for a mistrial made several witnesses later).

Despite defense counsel's failure to timely object during his own questioning of the witness, Appellee is now rewarded with a new trial.

Accordingly, I dissent.